**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Lead Counsel for Plaintiffs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JAMES CARMACK, MICHAEL NEUBERGER, BAHRAM SALEHIAN, AND ANDREW SONG, Individually and on Behalf of all Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMAYA INC., DAVID BAAZOV, AND DANIEL SEBAG, DIVYESH GADHIA, AND HARLAN GOODSON<br><br>Defendants. | **Case No. 16-CV-01884-JHR-JS**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiffs James Carmack, Michael Neuberger, Bahram Salehian, and Andrew Song ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against

Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Amaya Inc. ("Amaya" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired Amaya securities between May 26, 2015 and March 22, 2016, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors.

2. David Baazov was the founder of Amaya Inc., a Canadian corporation that trades on NASDAQ and the Toronto Stock Exchange. He took the Company public in 2010 and then engaged in a series of acquisitions that massively increased Amaya's size. Although Amaya was always in the gambling business, Amaya shifted in 2014 from a company that made gambling devices to sell to other companies, to a company that ran the largest internet based poker operation in the world.

3. Because mergers and acquisitions can have a major impact on a company's stock price, someone in Baazov's position, who oversaw several such acquisitions on behalf of Amaya over the course of a few years, would have an enormous opportunity to illicitly trade on his own company's information regarding its mergers and acquisitions before that information became public. Of course, such illegal conduct by Amaya's CEO would be easily detectable. To avoid detection, Baazov disseminated this information to friends, relatives, and associates, who then profited handsomely.

4. In 2014 the Quebec regulatory authorities began to investigate Baazov, but Baazov and Amaya publicly and repeatedly denied any wrongdoing. They instead repeatedly reassured investors that no Amaya employee, officer, or director had done wrong, that no officer committed fraud, and that the company had an insider trading policy that officers were required to follow. Subsequently, the

investing public learned the truth when Quebec authorities charged Baazov with insider trading.

## JURISDICTION AND VENUE

5. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

7. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and operate within this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

8. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

9. Plaintiff James Carmack, as set forth in the previously filed certification (Docket No. 1-1), purchased Amaya securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective

disclosures.

10. Plaintiff Michael Neuberger, as set forth in the previously filed certification (Docket No. 14-2), purchased Amaya securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

11. Plaintiff Bahram Salehian, as set forth in the previously filed certification (Docket No. 14-2), purchased Amaya securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

12. Plaintiff Andrew Song, as set forth in the previously filed certification (Docket No. 14-2), purchased Amaya securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13. Defendant Amaya provides technology-based products and services in the global gaming and interactive entertainment industries. Amaya's consumer technology business currently offers online and mobile real- and play-money poker and other online and mobile products, including casino, sports betting (also known as sportsbook) and daily fantasy sports. The Company is incorporated in Quebec, Canada with principal executive offices located at 7600 Trans Canada Hwy, Pointe-Claire, Quebec, Canada H9R 1C8. Amaya's securities trade on the NASDAQ under

the ticker symbol "AYA."

14. Defendant David Baazov ("Baazov") was the Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors of Amaya from 2006 when he founded Amaya until his leave of absence in March of 2016, followed by his resignation in August of 2016. From 2000 to 2006, Mr. Baazov was the founder of a business marketing company and served as the Vice President of Sales of Vortek Systems Inc., a supplier and distributor of computer hardware and accessories.

15. Defendant Daniel Sebag ("Sebag") was the Chief Financial Officer ("CFO"), Treasurer, and a director of Amaya throughout the Class Period. He began as CFO in July 2007 when he joined Amaya, and was appointed to the board in May of 2010. Sebag is a Chartered Accountant and specializes in the areas of cost management and financial reporting systems. He currently oversees the Corporation's financial reporting and treasury functions. Between 1999 and 2007, Sebag was a faculty lecturer at McGill University in Montreal, Québec, Canada where he led executive seminars in accounting and finance at its International Executive Institute, including the Directors Education Program and the Advanced Management Course. He has also taught advanced accounting courses to students in the McGill University MBA and Chartered Accountancy programs.

16. Divyesh Gadhia ("Gadhia") is the chairman of the board of Amaya. Throughout the class period and since May 2010 he was a member of the board of

Amaya. He was appointed chairman in March of 2016 after Baazov took a leave of absence. He is the chair of the special committee of directors that was originally formed to respond to Baazov's proposal to take Amaya private, but has since been tasked with investigating Baazov's fraud. He served as the Chief Executive Officer and Executive Vice Chairman of Gateway Casinos & Entertainment Limited from 1992 until 2010, where he was responsible for strategic initiatives, regulatory matters and governmental relations. He has served as a director of a number of other private and public companies, as well as charities, including a director of the Canadian Gaming Association from 2005 to 2010, and currently serves as a director of Gateway Casinos & Entertainment Limited and Trian Equities.

17. Harlan Goodson ("Goodson") has been a director of Amaya since May 11, 2010. Goodson served as the Director of California's Division of Gambling Control from 1999 to 2003, during which he led the implementation of California's Tribal-State Class III gaming compacts. Prior to forming his own law practice, The Law Office of Harlan W. Goodson, in Sacramento, California, Mr. Goodson was with the national law firm of Holland and Knight, LLP for 4 years where his practice concentrated on Gaming Law and Gaming Regulation and Governmental Affairs. Prior to being appointed to the position of Director of California's Division of Gambling Control, Mr. Goodson worked in the California State Senate as a legislative consultant for Senator Bill Lockyer from 1994 to 1999. Since 1996, Mr.

Goodson has been an adjunct law professor teaching classes on the legislative process and statutory interpretation at John F. Kennedy University, School of Law

18. Defendants Baazov, and Goodson, and Gadhia, are sometimes referred to herein collectively as the "Individual Defendants."

19. Defendant Amaya and the Individual Defendants are referred to herein, collectively, as the "Defendants."

20. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements or omissions alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's disclosure and procedure controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements or omissions were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

21. Amaya is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

22. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Amaya under respondeat superior and agency principles.

## **SUBSTANTIVE ALLEGATIONS**

### **Amaya's Background**

23. Amaya is a Canadian corporation with headquarters in suburban Montreal, Quebec. According to its website, Amaya was formed in 2004 and at that time and until 2014, was in the business of designing, developing, manufacturing, distributing, selling, and servicing gambling technology to online gambling services, physical gambling facilities, and government agencies. Amaya went public on the Toronto Stock Exchange on July 9, 2010.

24. Amaya thereafter made a series of acquisitions, including a purchase of Chartwell Technology, Inc., a gaming software and machine maker, in July 2011, for $22.77 million Canadian in stock and cash, CryptoLogic, LTD, an online gaming

software company, in April of 2012, for $35,817,144US, and Cadillac Jack, a manufacturer of gaming machines such as slot machines, in September of 2012, for US$167 million.

**<u>The Rational Group's Background</u>**

25. The predecessor to the Rational Group, Rational Enterprises, was a private Costa Rican company majority owned by Isai Scheinberg. Rational Enterprises launched PokerStars in 2001, which eventually grew to be the largest online poker company in the world. Essentially, PokerStars runs a website that allows individuals to play poker, for real money, with other people around the world over the internet through a computer program. According to an article in Forbes Magazine dated December 1, 2014, (the "Forbes Article"), PokerStars is a sophisticated, well run, and highly secure operation. At that time, internet gambling in the United States operated in a legal grey area, and PokerStars, as well as many competitors allowed American players to gamble on their sites. In 2002, the Fifth Circuit Court of Appeals held that the Wire Act does not prohibit any internet based gambling other than sports betting. *In re MasterCard Int'l Inc.*, 313 F.3d 257, 263 (5th Cir. 2002). In 2006, Congress passed the Unlawful Internet Gambling Enforcement Act (the "UIGEA") 31 USC §§ 5361-5366, which, according to the FDIC, "prohibits gambling businesses from knowingly accepting payments in connection with the participation of another person in a bet or wager that involves

the use of the Internet and that is unlawful under any federal or state law." As a result of the UIGEA, many online poker sites, including the largest at the time, Party Poker, which was run by a publicly traded British Corporation, pulled out of the U.S. market. PokerStars, however, did not. In addition, a competitor of PokerStars, Full Tilt Poker, continued to operate in the United States. As a result of PokerStars' decision to continue operating in the U.S., it became the largest internet poker site in the world.

26. In 2011, Scheinberg, along with several other individuals, including the CEO of TiltWare, the owner of Full Tilt Poker, were indicted for violations of the UIGEA. *See United States v. Tzvetkoff,* 10 – civ-00336 (SDNY 2010). A companion civil case was launched. *United States v. PokerStars, et al.*, 11 Civ. 2564 (2011). The Justice Department seized 76 bank accounts in 14 countries, including the bank accounts that held players' balances. After the seizure, the Department of Justice learned that while the account containing PokerStars' players' balances was well-capitalized and had sufficient funds to reimburse American players, the Full Tilt account was severely underfunded. As a result, in September of 2011, the United States filed an amended complaint that alleged that Full Tilt operated as a Ponzi scheme and stole player funds.

27. Ultimately, the civil case was settled for $731 million. Full Tilt Poker forfeited substantially all of its assets to the Department of Justice. PokerStars agreed

to forfeit $547 million to the U.S., and to reimburse $184 million to Full Tilt players. In exchange for that reimbursement, PokerStars received Full Tilt's assets from the United States government. PokerStars also agreed not to offer online poker in the U.S. for real money unless and until it is legal to do so under U.S. law. Notably, however, PokerStars was not barred from entering the U.S. market so long as a state legalizes gambling.

28. Several defendants pled guilty in the criminal action, but Scheinberg, who is not a U.S. resident, has never been arrested and the case against him is still pending.

**Amaya Acquires the Oldford Group**

29. According to the Forbes Article, Baazov made several overtures to Scheinberg regarding acquiring the Oldford Group that were not taken seriously at first because Oldford was considerably larger than Amaya. In the summer of 2013, Scheinberg told Baazov that negotiations could start if Baazov could provide a $3 billion commitment letter from a financial firm. At the same time, the Oldford Group refused to provide any financial information.

30. Baazov was able to retain such a financing letter from the Blackstone Group, and negotiations commenced.

31. During 2013, the Oldford Group attempted to obtain a license to operate in New Jersey. New Jersey law required that any online gambling company

operating in New Jersey be licensed as a casino. Obtaining such a license requires review by both the New Jersey Division of Gaming Enforcement and the New Jersey Casino Control Commission. In the fall of 2013, New Jersey regulators moved to suspend PokerStars' application for a gaming license due to Scheinberg's association with the company while an indictment against him was pending. New Jersey regulations forbid casino operators from receiving licenses if they are convicted of serious crimes, are charged with serious crimes, or act in such a way that is in violation of the criminal or civil public policies of the State of New Jersey.

32. In early 2014, Amaya and Oldford signed a letter of intent with a $4.9 billion price tag.

33. In order to raise sufficient financing, Baazov approached Blackstone, proposing that Blackstone and others buy Amaya shares to finance the deal at $18 per share, and convertible securities at $21 per share, despite the fact that Amaya was trading at less than $7 per share. According to the Forbes Article, the Blackstone Group representatives "abruptly ended the meeting and threw Baazov out on the street." Eventually, however, Baazov was able to secure financing for the deal.

34. In August of 2014, Amaya acquired Oldford Group. The Oldford Groups' subsidiaries, which are referred to in Amaya's financial statements as "The Rational Group," the owner and operator of leading online poker sites PokerStars and Full Tilt, as well as live poker tournaments.

35. PokerStars and Full Tilt are real money online poker websites which together hold a majority of the global market share of real money online poker playing.

36. The Oldford Group acquisition turned Amaya into the world's largest publicly traded online gambling company.

37. On June 8, 2015, Amaya common shares began trading on NASDAQ.

38. On September 30, 2015, Amaya announced that the New Jersey Division of Gaming Enforcement authorized Amaya to operate the PokerStars and Full Tilt brands in New Jersey. Amaya previously entered into an agreement with Resorts Casino Hotel in Atlantic City to provide online poker and casino offerings in New Jersey through the PokerStars and Full Tilt brands. In order to obtain a license from the state of New Jersey, Amaya was required to sever any association with Scheinberg, his son, and other executives and members of management not specified in public filings by Amaya.

39. On March 21, 2016, Amaya fully launched PokerStars online poker and casino in New Jersey.

**The AMF Investigates Baazov and Sebag for Insider Trading**

40. On December 11, 2014, the Autorité des Marchés Financiers (literally the "Financial Markets Authority" and referred to herein as the "AMF"), the securities regulatory authority in the Province of Quebec, launched an investigation

into trading activities in Amaya securities surrounding the Company's $4.9 billion acquisition of the Oldford Group, the owner and operator of leading online poker sites PokerStars and Full Tilt, in August 2014.

41. On March 3, 2016, the AMF sought an emergency stop trading order (the "AMF Application") in an ex parte application with the Bureau de Décision et de Révision ("BDR"), attached hereto, and accompanied by a translation, as Exhibit 1, which is incorporated by reference as if fully set forth herein. The AMF application was accompanied by a sworn affidavit from Xavier Saint-Pierre, an investigator for the AMF, who swore that all of the facts contained within the AMF Application are true.

42. The AMF Application details the AMF's evidence that Baazov leaked confidential information about Amaya's acquisitions of Cryptologic, Chartwell, and the Oldford Group, as well as an attempted acquisition of BWIN.Party and an attempted purchase of Amaya by Baazov. The AMF application further details evidence indicating Baazov received material nonpublic information from an attorney with Greenberg Traurig, Marlon Goldstein, who represented Scientific Games in its acquisition of WMS. Goldstein was subsequently hired by Amaya as an Executive Vice President in 2014. It also indicates that Baazov received and then disseminated to others confidential information regarding an acquisition of Gamesys by the Intertain Group that allowed them to illegally trade on the confidential

information.

43. According to the AMF, numerous individuals and entities were involved in this scheme:

a. Josh Baazov, the brother of Baazov and the employer of Baalev Investments, Inc. ("Baalev").

b. Craig Levett, the CEO and sole shareholder of Baalev

c. Nathalie Bensmihan, the wife of Craig Levett

d. Earl Levett, the brother of Craig Levett,

e. Karl Fallembaum, a friend of Craig Levett

f. Isam Mansour, an employee of 9278-7688 Québec Inc.

g. Mona Kassfy, the wife of Isam Mansour

h. Allie Mansour, the brother of Isam Mansour

i. John Chatzidakis, a friend of Isam Mansour

j. Alain Anawati, a friend of Isam Mansour

k. Feras Antoon

l. Eleni Psicharis, the wife of Chatzidakis

m. Mark Wael Antoon, Feras Antoon's brother

n. Robert Mincoff, the compliance director of Amaya

o. Sam Pai, the controller of Amaya

44. Overall, the AMF's evidence primarily consists of logs of phone calls

between the various participants in the insider trading scheme listed in the preceding paragraph (collectively the "Baazov Trading Ring"), as well as records of the Baazov Trading Ring members' stock trades. Those records were submitted to the BDR, and though they were not made public, their relevant contents are described in detail in the AMF Application. With respect to each of the transactions detailed in the AMF Application, Baazov repeatedly contacted Josh Baazov or other members of the Baazov Trading Ring, who would then contact other members of the trading ring. Shortly after receiving these communications, the Baazov Trading Ring members would trade in the very security about which Baazov had recently learned new material nonpublic information. After each transaction was consummated, the members of the Baazov Trading Ring liquidated their holdings. A full list of the communications between the members of the Baazov Trading Ring, and their transactions is set forth in the AMF Application, ¶¶67-218. A full list of all calls between members of the Baazov Trading Ring, as well as all transactions by them, is attached hereto as Exhibit 4, which is incorporated by reference as if fully set forth herein. In all, the AMF Application details over several hundred transactions that closely followed phone calls between members of the Baazov Trading Ring.

45. On some occasions, members of the Baazov Trading Ring would place "limit" orders – that is, orders to sell a specific stock if it hit a specific price. In one case, Isam Mansour placed a limit order on CHW stock at $1.25 when the stock was

trading at $.78 – suggesting that Mansour was highly confident that the price would surge in value. In another Mansour placed a limit order that would expire after two days for CHW at 150% of the current trading price – suggesting that Mansour anticipated a drastic price increase. Mansour placed a similar limit order on WMS stock.

46. As a result of these trades, members of the Baazov Trading Ring profited as follows:

| Title of the issuer | Respondents | Profits earned |
|---|---|---|
| Cryptologic Ltd. | Craig Levett | $10,227 Canadian |
| | Isam Mansour | $13,953 Canadian |
| | John Chatzidakis | $7,575 Canadian |
| | Allie Mansour | $6,900 Canadian |
| | | |
| Chartwell Technology Inc. | Craig Levett | $5,187 Canadian |
| | Isam Mansour | $10,574 Canadian |
| | John Chatzidakis | $8,439 Canadian |
| | Alain Anawati | $9,620 Canadian |
| | | |
| WMS Industries Inc. | Craig Levett | $25,216.66 US |
| | Isam Mansour | $25,324.49 US |
| | Allie Mansour | $6,384 US |
| | Nathalie Bensmihan | $31,615.76 US |
| | Earl Levett | $76,952.70 US |
| | Karl Fallenbaum | $4,035.92 US |
| | | |
| Amaya / Oldford Group | Craig Levett | $152,567 Canadian |
| | Isam Mansour | Approximately $256,039 Canadian |
| | Eleni Psicharis | $46,605 Canadian |
| | Allie Mansour | $67,264 Canadian |

| | | |
|---|---|---|
| | Earl Levett | $155,839 Canadian |
| | Karl Fallenbaum | $111,478 Canadian |
| | Mona Kassfy | $17,285 Canadian |
| | | |
| BWIN Party | Craig Levett | £26,227 |
| | Isam Mansour | $122,606 Canadian |
| | Allie Anawati | $11,965 Canadian |
| | Earl Levett | $11,132 Canadian |
| | Feras Antoon | $38,617 Canadian |
| | Mark Wael Antoon | $1,568 Canadian |
| | Eleni Psicharis | $13,829 Canadian |
| | | |
| INTERTAIN | Isam Mansour | $16,658 Canadian |
| | Eleni Psicharis | $200 Canadian |
| | Mona Kassfy | $3,173 Canadian |
| | Feras Antoon | $44,812 Canadian |
| | Mark Wael Antoon | $1,776 Canadian |
| | | |
| Amaya (going private transaction) | Isam Mansour | $56,513 Canadian |
| | Allie Mansour | $3,620 Canadian |
| | Earl Levett | $1,435 Canadian |

47. In total, the members of the Baazov Trading Ring profited an equivalent of $1,122,969 US Dollars at today's exchange rate.

48. The BDR issued orders enjoining members of the Baazov Trading Ring from trading on March 22, 2016. The BDR found that, "The inquiry by the Authority [AMF] reveals that, since at least December 28, 2010, David Baazov, accused, has been the source of several leaks of inside information regarding the financial activities of Amaya and those of other companies, including WMS Industries Inc. and The Intertain Group Limited. These transmissions of inside information

specifically occurred while acquisition projects, in particular involving the aforementioned companies, were in discussions or being carried out, and the accused David Baazov was at the heart of these transactions or was aware of them." Decision of the BDR ("BDR Decision") attached hereto, along with a translation, as Exhibit 2, ¶25. Exhibit 2 is incorporated by reference as if fully set forth herein. The BDR went on to find that "according to the evidence submitted by the Authority, a considerable number of violations related to the use of inside information were committed by the respondents in the context of this case, and the main source of this inside information was the accused David Baazov." *Id.* ¶97. The BDR noted that while the investigation into Baazov was ongoing, "[i]t has … already shed light on a complex set of stock transactions, funds movements between various accounts and telephone calls revealing a modus operandi that would place the accused David Baazov at the source of a major leak of inside information from which the respondents financially benefited." ¶98. "The evidence contains telephone recordings that directly confirm the *modus operandi* of the respondents observed by the inquiry by the Authority. This *modus operandi* demonstrates a leak of inside information primarily going from the accused David Baazov to his brother, the respondent Josh Baazov, to next be relayed to the respondents Craig Levett and Isam Mansour, and then trickle down to the other respondents with whom the latter had ties of various natures." ¶99. "This information, not known to the public, was used

illegally by the respondents to perform the stock transactions and achieve gains that the Authority currently assesses at more than one million dollars. For his part, the respondent Josh Baazov indirectly achieved gains through transactions done illegally through the respondents Craig and Earl Levett or received 'gift checks' for providing inside information coming from his brother, the accused David Baazov." The board noted that the evidence set forth show "prima facie circumstantial evidence that the Board considers preponderant." *Id.* ¶104.

49. That same day, Baazov was charged with insider trading in a Quebec Court, attached hereto, with a translation, as Exhibit 3, which is incorporated by reference as if fully set forth herein. Baazov was specifically charged with violating Section 187 of Quebec's Securities Act, which states that:

> No insider of a reporting issuer having privileged information relating to securities of the issuer may trade in such securities or change an economic interest in a related financial instrument, except if he can prove that:
> (1) he is justified in believing that the information is generally known or known to the other party;
> (2) he is availing himself of an automatic dividend reinvestment plan, automatic subscription plan or any other automatic plan established by a reporting issuer, according to conditions set down in writing, before he learned the information; or
> (3) he is required to do so under a contract the terms of which are set out in writing and which was entered into before he became aware of the information.
> In the case described in subparagraph 1 of the first paragraph, the insider may not trade in the securities if the other party to the transaction is the reporting issuer and the transaction is not necessary in the course of the issuer's business.

50. Baazov was also charged with violating Section 188 of the Securities Act, which states that:

> No insider of a reporting issuer having privileged information relating to securities of the issuer may disclose that information or recommend that another party trade in the securities of the issuer, except in the following cases:
> (1) he is justified in believing that the information is generally known or known to the other party;
> (2) he must disclose the information in the course of business, having no ground to believe it will be used or disclosed contrary to section 187, 189 or 189.1 or to this section.

51. Baazov was further charged with violating Section 195.2, which states that "Influencing or attempting to influence the market price or the value of securities by means of unfair, improper or fraudulent practices is an offence."

52. Finally, Baazov was charged with violating Section 199.1.

> A person who directly or indirectly engages or participates in any transaction or series of transactions in securities or any trading method relating to a transaction in securities, or in any act, practice or course of conduct is guilty of an offence if the person knows, or ought reasonably to know, that the transaction, series of transactions, trading method, act, practice or course of conduct
> (1) creates or contributes to a misleading appearance of trading activity in, or an artificial price for, a security; or
> (2) perpetrates a fraud on any person.

53. These violations are criminal in nature, and carry a maximum penalty of five years less one day in prison.

54. Given New Jersey laws regarding the licensing of Casino's, which strictly forbid criminal conduct by Casino operators, Baazov's conduct jeopardized

Amaya's ability to retain a license to operate in New Jersey.

**Defendants' Materially False and Misleading Statements and Omissions**

55. On May 26, 2015, the Company filed a Registration Statement on Form 40-F (the "May Registration Statement") with the SEC as part of listing its common stock on NASDAQ for trading.

56. Attached as exhibits 99.9 and 99.10 to the May Registration Statement were Certifications of Refiled Annual Filings for the year ending December 31, 2014, dated May 1, 2015, and signed by Defendants Baazov and Sebag, respectfully. Both certifications stated in relevant part:

> ***Reporting to the issuer's auditors and board of directors or audit committee:*** The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of ICFR, to the issuer's auditors, and the board of directors or the audit committee of the board of directors any fraud that involves management or other employees who have a significant role in the issuer's ICFR [internal controls over financial reporting].

57. The statement in the foregoing paragraph was misleading for omitting to disclose that Baazov himself had committed fraud.

58. Attached as Exhibit 99.104 to the May Registration Statement was a press release dated April 8, 2015 discussing the AMF's investigation into insider trading related to Amaya. It stated that "The company is confident that at the end of the investigation the AMF will come to the same conclusion as Amaya has — that if there were violations of Canadian securities laws, they were not committed by the

Company, officers or directors."

59. The statement in the preceding paragraph was misleading for omitting to disclose that Baazov did not adhere to Company's insider trading policies.

60. Attached as Exhibit 99.107 was Amaya's code of business conduct, which stated that "All employees, officers and directors must also adhere to the Company's procedures and practices on confidentiality, disclosure and insider trading."

61. The statement in the preceding paragraph was misleading for claiming that Amaya had reached the conclusion that no violation of Canadian securities laws were committed by Company officers because it omitted to disclose that Baazov had violated Canadian securities laws by engaging in insider trading.

62. On June 1, 2015, Amaya filed a press release attached as Exhibit 99.1 to a Form 6-K that quoted David Baazov as stating that "I believe that any concerns that I or other Amaya officers or directors violated any Canadian securities laws are unfounded and we are confident that at the end of its investigation, the AMF will come to the same conclusion."

63. The statement in the preceding paragraph was misleading for claiming that Amaya had reached the conclusion that no violation of Canadian securities laws were committed by Company officers because Baazov was fully aware that he had violated Canadian securities laws by engaging in insider trading and omitted to so

disclose.

64. On November 30, 2015, the Company filed a Registration Statement on Form F-10/A (the "November Registration Statement") with the SEC. The November Registration Statement incorporated the May Registration Statement by reference and was signed by Defendants Baazov and Sebag. The statements therein were therefore misleading for the same reasons the May Registration Statement was misleading as set forth in paragraphs 55 to 63 above.

65. On March 14, 2016, the Company filed its annual report for the fiscal year ended December 31, 2015 on Form 40-F (the "2015 40-F") with the SEC. The 2015 40-F contained exhibits including Amaya's Annual Information Form, Auditor Consolidated Financial Statements, and Management's Discussion and Analysis for the year ended December 31, 2015. The 2015 40-F was signed by Defendant Sebag. The 2015 40-F also contained signed certifications pursuant to the Sarbanes Oxley Act of 2002 by Defendants Baazov and Sebag stating that they each disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting."

66. The statement in the foregoing paragraph was misleading for omitting to disclose that Baazov himself had committed fraud.

**The Truth Emerges**

67. On March 23, 2016, the AMF issued a press release announcing that it

had filed charges against Defendant Baazov, stating in relevant part:

**Matter of Amaya inc. - AMF files 23 charges against three individuals and three companies**

> MONTRÉAL, March 23, 2016 /CNW Telbec/ - T***he Autorité des marchés financiers (the "AMF") has filed penal proceedings consisting of 23 charges against David Baazov*** , Benjamin Ahdoot , Yoel Altman, Diocles Capital inc, Sababa Consulting inc. and 2374879 Ontario inc.
>
> ***More specifically, David Baazov, president, CEO, board chairman and a significant shareholder of Amaya inc., is facing five charges, in particular for aiding with trades while in possession of privileged information, influencing or attempting to influence the market price of the securities of Amaya inc., and communicating privileged information.***
>
> Benjamin Ahdoot and Yoel Altman are facing, respectively, four and six charges, in particular for trading while in possession of privileged information and influencing or attempting to influence the market price of the securities of Amaya inc.
>
> Diocles Capital inc. is facing five charges of trading while in possession of privileged information and influencing or attempting to influence the market price of the securities of Amaya inc. Sababa Consulting inc. and 2374879 Ontario inc. are facing a total of three charges for trading while in possession of privileged information.
>
> Based on the AMF's investigation, the respondents are alleged in particular to have used, between December 2013 and June 2014, privileged information pertaining to the securities of Amaya inc. for trading purposes. As well, a few of the respondents are alleged to have conspired to commit some of the offences.
>
> "We have made suppressing illegal insider trading and market manipulation a top priority, as this type of conduct profoundly affects public confidence and the integrity of our markets," said AMF President and CEO Louis Morisset.

> Under the provisions of the *Securities Act* (Québec), pursuant to which these proceedings are filed, offenders are liable to stiff fines as well as prison terms.
>
> The AMF is pursuing its investigation in this matter and may file other charges.
>
> The *Autorité des marchés financiers* (the "AMF") is the regulatory and oversight body for Québec's financial sector.

(Emphasis added).

68. On this news, shares of Amaya immediately fell $3.07 per share or approximately 21.5% from its previous day's closing price to close at $11.18 per share on March 23, 2016, damaging investors.

69. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**Additional Allegations Supporting Scienter of Baazov**

70. Baazov's scienter can be inferred from the fact that the allegations set forth herein concern his personal conduct. The AMF and the BDR repeatedly found that Baazov provided material nonpublic information to a group of confederates on numerous occasions.

71. Further supporting Baazov's scienter is the Baazov Trading Ring's efforts to conceal their conduct. According to the International Consortium of Investigative Journalists, a project of the Center for Public Integrity, the winner of the 2014 Pulitzer Prize for investigative journalism, Goulissa Baazov and Isam

Mansour are both shareholders of Zhapa Holdings, Inc., a BVI corporation.

72. Further demonstrating Baazov's scienter is the fact that his brother, Josh Baazov, received kickbacks in the form of gifts from other members of the Baazov Trading Ring for providing inside information.

73. Baazov's scienter is also bolstered by the fact that as CEO and Chairman, he was responsible for the Company's insider trading policies. Therefore, he was familiar with their contents and well aware that dissemination of insider information to confederates was improper.

74. In addition, at the time the misleading statements and omissions were made, Baazov was aware that Amaya was under investigation by the AMF and conducting its own internal investigation into the illegal activities of the Insider Trading Ring. Therefore, Baazov was even more acutely aware than prior to the investigation of the precise requirements of Quebec's insider trading laws.

**Additional Allegations Supporting Scienter of Sebag**

75. Sebag's scienter can be inferred from the fact that the allegations set forth herein concern his personal conduct. Levett received calls from Levett, one of the members of the Baazov Trading Ring, during the acquisition of Cryptologic, before Levett traded on that information.

76. Sebag's scienter can also be inferred from the fact that his family member, Stephen Sebag, was a shareholder of Zhapa Holdings, Inc.

77. In addition, at the time the misleading statements and omissions were made, Sebag was aware that Amaya was under investigation by the AMF and conducting its own internal investigation into the illegal activities of the Insider Trading Ring. Therefore, Sebag was even more acutely aware than prior to the investigation of the precise requirements of Quebec's insider trading laws.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

78. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Amaya securities trade on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

79. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Amaya securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records

maintained by Amaya or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

80. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

81. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

82. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Amaya;
- whether the Individual Defendants caused Amaya to issue false and misleading public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of Amaya securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

83. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

84. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

85. The market for Amaya stock was an efficient market for the following reasons, among others:

86. Amaya's common stock was listed and actively traded on the NASDAQ and Toronto Stock Exchange, highly efficient national markets;

a. During the class period, on average, almost 1% of the shares outstanding of Amaya stock were traded on a weekly basis, demonstrating a very active and broad market for Amaya stock and permitting a very strong presumption of an efficient market and was covered by at least twenty analysts, and at least 69 market makers on NASDAQ and 67 in Toronto;

b. As a registered and regulated issuer of securities, Amaya filed periodic reports with the SEC and the AMF, in addition to the frequent voluntary dissemination of information;

c. Amaya regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d. Amaya was followed by at least twenty analysts, which followed Amaya's business and wrote reports which were publicly available and affected the public marketplace;

e. Unexpected material news about Amaya was rapidly reflected and incorporated into the Company's stock price during the Class Period.

f. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Amaya's stock; and

g. Without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased or otherwise acquired Amaya Stock between the time the Defendants made the material misrepresentations and omissions and the time that the truth was revealed,

during which time the price of Amaya stock was artificially inflated by the Defendants' misrepresentations and omissions.

87. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## Violation of Section 10(b) of The Exchange Act and Rule 10b-5

## Against Defendants Baazov, Sebag, and Amaya

88. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

89. This Count is asserted against Defendants Baazov, Sebag, and Amaya and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

90. During the Class Period, Defendants Baazov, Sebag, and Amaya engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Amaya securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Amaya securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants Baazov, Sebag, and Amaya, and each of them, took the actions set forth herein.

91. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants Baazov, Sebag, and Amaya participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Amaya securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Amaya's disclosure controls and procedures, business operations, and employee conduct.

92. By virtue of their positions at Amaya, Defendants Baazov, Sebag, and Amaya had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants Baazov, Sebag, and Amaya acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants Baazov, Sebag, and Amaya. Said acts and omissions of Defendants Baazov, Sebag, and Amaya were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

93. Information showing that Defendants Baazov, Sebag, and Amaya acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Amaya, the Defendants Baazov and Sebag had knowledge of the details of Amaya's internal affairs.

94. Defendants Baazov and Sebag are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants Baazov and Sebag were able to and did, directly or indirectly, control the content of the statements of Amaya. As officers and/or directors of a publicly-

held company, Defendants Baazov and Sebag had a duty to disseminate timely, accurate, and truthful information with respect to Amaya's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for Amaya's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Amaya's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Amaya securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

95. During the Class Period, Amaya's securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants Baazov, Sebag, and Amaya made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Amaya securities at prices artificially inflated by Defendants Baazov, Sebag, and Amaya's wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.

At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Amaya securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Amaya's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

96. By reason of the conduct alleged herein, Defendants Baazov, Sebag, and Amaya knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

97. As a direct and proximate result of Defendants Baazov, Sebag, and Amaya's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**

**Against Defendants Baazov and Sebag**

98. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99. During the Class Period, Defendants Baazov and Sebag participated in the operation and management of Amaya, and conducted and participated, directly

and indirectly, in the conduct of Amaya's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Amaya's business practices.

100. As officers and/or directors of a publicly owned company, Defendants Baazov and Sebag had a duty to disseminate accurate and truthful information with respect to Amaya's financial condition and results of operations, and to correct promptly any public statements issued by Amaya which had become materially false or misleading.

101. Because of their positions of control and authority as senior officers, the Defendants Baazov and Sebag were able to, and did, control the contents of the various reports, press releases and public filings which Amaya disseminated in the marketplace during the Class Period. Throughout the Class Period, Defendants Baazov and Sebag exercised their power and authority to cause Amaya to engage in the wrongful acts complained of herein. Defendants Baazov and Sebag therefore, were "controlling persons" of Amaya within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Amaya securities.

102. Each of Defendants Baazov and Sebag, therefore, acted as a controlling person of Amaya. By reason of their senior management positions and/or being directors of Amaya, each of Defendants Baazov and Sebag had the power to direct

the actions of, and exercised the same to cause, Amaya to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Amaya and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

103. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Amaya.

**COUNT III**

**For Violations of Section 11 of the Securities Act**

**Against All Defendants**

104. This claim does not *sound* in fraud. For the purposes of this Section 11 claim, Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act. This claim is based solely on strict liability.

105. Plaintiff realleges each allegation as if fully set forth herein.

106.

107. This claim is brought under §11 of the Securities Act, 15 U.S.C. § 77k, against all Defendants.

108. The Registration Statement was inaccurate and contained untrue

statements of material fact, omitted to state facts necessary to make the statements made therein not inaccurate, and omitted to state material facts required to be stated therein.

109. Amaya was the registrant for the Registration Statement. As the issuer of stock, Amaya is strictly liable to Plaintiffs and the Class for the materially inaccurate statements in the Registration Statement and the failure of the Registration Statement to be complete and disclose the material information required pursuant to the regulations governing its preparation.

110. Sebag signed the Registration Statement either personally or through Attorney-in-Fact and caused its issuance. Sebag had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. Sebag had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate. By virtue of Xiao and Chang failure to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact. As such, Sebag is strictly liable to Plaintiffs and the Class.

111. The Individual Defendants failed to perform adequate due diligence in connection with their role as Directors and were negligent in failing to ensure that

the Registration Statement was prepared properly and accurately. The Individual Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Individual Defendants are strictly liable to Plaintiff and the Class.

112. Defendants were responsible for the contents and dissemination of the Registration Statement. None of them made a reasonable investigation of possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate.

113. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

114. At the time of Defendants' false statements, misrepresentations, and omissions in the 2014 Offering Documents, Plaintiffs and the Class were unaware of their falsity and believed them to be true. Plaintiffs and the Class would not otherwise have purchased Amaya Shares had they known the truth about the matters discussed above.

115. By virtue of the foregoing, Defendants have violated §11 of the

Securities Act.

116. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of Amaya Stock traceable to the Offering.

117. This claim was brought within one year after Plaintiffs discovered or reasonably could have discovered the untrue statements and omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement.

**COUNT IV**

**For Violations of Section 15 of the Securities Act Against the Individual Defendants**

118. Plaintiff realleges each allegation as if fully set forth herein.

119.

120. This claim is brought under §15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants.

121. Each of the Individual Defendants, by reason of their status as senior executive officers of Amaya, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §15 of the Securities Act. The Individual Defendants directly or

indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff's and the Class' investments in Amaya stock within the meaning of §15 of the Securities Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

122. The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

123. The Individual Defendants knew or recklessly disregarded the fact that Amaya's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

124. By virtue of their high-level positions and their participation in and awareness of Amaya's operations and public statements, the Individual Defendants were able to and did influence and control Amaya's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

125. The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

126. As set forth herein Defendants each violated §11 of the Securities Act by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §15 of the Securities Act.

127. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Amaya stock.

128. This claim was brought within one year after Plaintiffs discovered or reasonably could have discovered the untrue statements and omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demands a trial by jury.

Dated: August 31, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Lead Counsel for Plaintiffs

POMERANTZ LLP

Jeremy A. Lieberman
Tamar Weinrib
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Additional Counsel to Plaintiffs