UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JAMES CARMACK, MICHAEL      :      Hon. Joseph H. Rodriguez
NEUBERGER, BAHRAM SALEHIAN,
AND ANDREW SONG, Individually      :      Civil Action No. 16-1884
and on Behalf of all Others
Similarly Situated,      :      OPINION

     Plaintiffs,      :

     v.      :

AMAYA INC., DAVID BAAZOV,      :
DANIEL SEBAG, DIVYESH GADHIA,
AND HARLAN GOODSON,      :

     Defendants.      :

This securities fraud matter is before the Court on four motions to dismiss filed by Defendants. The Court heard oral argument on the motions on May 23, 2017 and the record of that proceeding is incorporated here. For the reasons placed on the record that day and those provided below, the motions of Defendants Amaya, Inc. [47] and David Baazov [50] will be denied. The motions of Daniel Sebag [48] and Divyesh Gadhia and Harlan Goodson [49] will be granted in part and denied in part.

## Background

Plaintiffs have alleged that Amaya, a Canadian company that has always been in the business of gambling, grew significantly as a result of

multiple acquisitions to run the largest internet-based poker operation in the world. (Am. Compl. ¶ 2.) Defendant David Baazov was CEO, President, and Chairman of the Board of Directors of Amaya from 2006, when he founded the company, until his leave of absence in March 2016. (Am. Compl. ¶ 14.) As such, Baazov possessed valuable insider information regarding these acquisitions. Plaintiffs allege that he disseminated this insider information to friends, relatives, and associates in contravention of securities regulations and Amaya's own policies prohibiting insider trading. (Am. Compl. ¶ 3.) Amaya and Baazov denied any wrongdoing when the Autorité des Marchés Financiers ("AMF"), the securities regulatory authority in the Province of Quebec, began to investigate Baazov in 2014. (Am. Compl. ¶ 4.) That initial investigation, later expanded in 2015, focused on trading activities relating to Amaya's August 2014 $4.9 billion acquisition of the Oldford Group, Inc. (Am. Compl. ¶ 40.) This particular acquisition was notable not only because it propelled Amaya to the number one publicly traded online gaming company in the world but because it led to Amaya's entry into the United States market via a temporary authorization to operate in New Jersey. (Am. Compl. ¶ 36, 38.)

On June 12, 2014, Amaya announced its potential acquisition of Oldford Group, the owner and operator of, among other things, online

poker sites. (Am. Compl. ¶ 32; Horowitz Decl. Ex. A.) That same day, the AMF launched an investigation into trading in Amaya securities in advance of the Announcement. (Am. Compl. Ex. 3.) On December 11, 2014, AMF executed search warrants at Amaya's headquarters indicating that the investigation involved three or four Amaya employees, including Baazov and Sebag, and 21 other individuals who traded in Amaya's securities. That day, Amaya issued a press release confirming that it and its officers were cooperating with the AMF Investigation. Amaya stated "[t]he investigation has had no impact on Amaya's business operations, employees or companies." (Horowitz Decl. Ex. B; Ex. C at 5.)

On March 31, 2015, Amaya issued a press release attached as Exhibit 99.103 to its May 26, 2015 Registration Statement filed pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act"). In the release, Amaya summarized the December 11, 2014 press release as follows:

> Amaya thoroughly reviewed the relevant internal activities around the Oldford Group acquisition and has found no evidence of any violation of Canadian securities laws or regulations. Nor has the corporation been provided with any evidence that any executives, directors or employees violated any securities regulations.

(Horowitz Decl. Ex. C at 5.)

On April 8, 2015, Amaya issued a press release following a Quebec court's decision to release redacted copies of a warrant and supporting

affidavit issued in connection with the AMF investigation. (Am. Compl. ¶ 58; Horowitz Decl. Ex. D.) In the release, attached as Exhibit 99.104 to Amaya's May 26, 2015 Registration Statement, Amaya noted that:

> [R]elease of the redacted documents presents nothing new to Amaya. Amaya has previously received the redacted affidavit and reviewed its limited contents and did not contest the court's decision today. It will wait to see the actual unredacted affidavit, but it does not believe there is a reasonable basis for proceedings against Amaya or its employees.

(Horowitz Decl. Ex. D.) Amaya confirmed that it "has been fully cooperating with regulators since approximately one week after it announced its acquisition of Oldford Group on June 12, 2014, and has been required to maintain strict confidentiality during the process." (*Id.*) Amaya also stated:

> Certain documentation related to the investigation are and have been sealed by court order and Amaya has not been able to discuss the details of their contents without risking being in contempt of court. This means Amaya has not been and is still not permitted by the court to comment on individuals named in the investigation documents.
>
> Amaya has also yet to obtain an unredacted version of the affidavit since the investigation was first announced. A court ordered seal remains in place related to details of the warrant and the redacted contents of the affidavit.

(*Id.*) In the April 8, 2015, release, Ben Soave, retired Chief Superintendent of the Royal Canadian Mounted Police, a member of Amaya's Compliance Committee, and an advisor to Amaya's Board of Directors, stated:

> We have thoroughly reviewed the relevant internal activities around [Amaya's] acquisition of Oldford Group and have found no evidence of any violation of Canadian securities laws or regulations including tipping and insider trading by CEO David Baazov and CFO Daniel Sebag. Additionally, the company has not been provided with any evidence that my executives, directors, or employees violated any securities laws or regulations.

(*Id.*) The company stated it "is confident that at the end of the investigation the AMF will come to the same conclusion as Amaya has-that if there were violations of Canadian securities laws, they were not committed by the Company, officers or directors." (*Id.*; Am. Compl. ¶ 58.) Plaintiffs allege this statement was misleading because it did not disclose that Baazov did not adhere to Amaya's insider trading policies. (Am. Compl. ¶ 59.)

On May 26, 2015, Amaya filed its Registration Statement pursuant to Section 12 of the Exchange Act signed by Daniel Sebag as CFO on SEC Form 40-F in order to become a reporting company under the Act. (Am. Compl. ¶ 55.) Attached to the May 26, 2015 Registration Statement as exhibits 99.5 and 99.11 were financial statements signed by Daniel Sebag, as CFO, and David Baazov, as CEO, for the year ending December 31, 2014 and the period ending March 31, 2015. (Rosen Decl. Ex. 1.) Attached as exhibits 99.9 and 99.10 to the May Registration Statement were Certifications of Annual Filings for the year ending December 31, 2014,

dated May 1, 2015, and signed by Defendants Baazov as CEO and Sebag as CFO. Each certification stated in relevant part:

> ***Reporting to the issuer's auditors and board of directors or audit committee:*** The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of ICFR, to the issuer's auditors, and the board of directors or the audit committee of the board of directors any fraud that involves management or other employees who have a significant role in the issuer's ICFR [internal controls over financial reporting].

(Am. Compl. ¶ 56.) These statement ostensibly were signed to satisfy Section 302(a)(5)(B) of the Sarbanes-Oxley Act that each signator had disclosed any fraud by management. (Am. Compl. ¶ 56.) The class period starts here, as Plaintiffs assert that this statement was misleading for failing to disclose that Baazov himself had committed fraud. (Am. Compl. ¶ 57.)

On June 1, 2015, Amaya issued a press release that was filed with the SEC on Form 6-K, signed by Sebag to satisfy Amaya's obligations under the Exchange Act. (Am. Compl. ¶ 62; Horowitz Decl. Ex. E.) The Company stated while it was "not permitted by law to disclose further details surrounding the AMF investigation," Amaya requested and received permission from the AMF to make the following disclosure:

> As previously announced by Amaya, the [AMF], the securities regulatory authority in the Province of Quebec, is conducting an investigation into the trading of Amaya securities surrounding the announcement of the Oldford Group acquisition on June 12, 2014. The investigation involves employees of Amaya, including

David Baazov, Chief Executive Officer of the Corporation and Daniel Sebag, Chief Financial Officer of the Corporation (but not involving any personal trading by such individuals). The AMF has neither announced any proceedings nor filed any charges.

(*Id.*) Soave further stated:

> To date, the AMF has neither threatened nor initiated any legal proceedings against the Corporation or its employees. Amaya has also not been provided with any evidence that any officers, directors, or other employees violated any securities laws or regulations.
>
> Nonetheless, as we previously announced, the Corporation conducted an internal review, supervised by its independent board members with the assistance of external legal counsel, which thoroughly reviewed the relevant internal activities surrounding the Oldford Group acquisition. This review found no evidence of any violations of Canadian securities laws or regulations.

(*Id.*) Defendant Gadhia, Amaya's current Chairman (then-Lead Director and independent board member) stated: "The Corporation is not aware of any reasonable basis for proceedings against Amaya or its directors, officers or employees." (*Id.*) Baazov stated: "I believe that any concerns that I or other Amaya officers or directors violated any Canadian securities laws are unfounded and we are confident that at the end of its investigation, the AMF will come to the same conclusion." (*Id.*)

On June 8, 2015, Amaya common shares began trading on NASDAQ. (Am. Compl. ¶ 37.)

On July 23, 2015, the AMF expanded its investigation to transactions in the securities of various companies, including Amaya. By statute (Quebec Securities Act § 244), the investigation, like all such investigations, was confidential. Defendants characterize this as a separate investigation because the ex parte application indicates the investigation "began" July 23, 2015 and identified different individuals from those included in the December 2014 warrant.

On November 10, 2015, Amaya filed a Form F-10 Registration Statement under the Securities Act of 1933 ("Securities Act") with the SEC registering up to $3 billion of debt and equity securities. (Am. Compl. ¶ 64; Horowitz Decl. Ex. F.) This Registration Statement/Prospectus incorporated by reference exhibits to the May 26, 2015 Registration Statement and was signed by Baazov, Sebag, Gadhia, and Goodson. (*Id.*)

On March 7, 2016, the AMF filed an ex parte confidential application with the BDR for an emergency freeze and cease trading order against 13 respondents, not including Amaya, Baazov, or Sebag. (Am. Compl. Ex. 1.) The application detailed AMF's evidence that Baazov leaked confidential information about Amaya's acquisitions that allowed for trades based on confidential information. (Am. Compl. ¶ 42.)

On March 14, 2016, Amaya filed its annual report signed by Sebag for the fiscal year ending December 31, 2015 on Form 40-F. (Am. Compl. ¶ 65.) It contained Sarbanes-Oxley certifications signed by Baazov and Sebag that they had disclosed to the board of directors any fraud involving management that has control over financial reporting. Plaintiffs allege this was a misleading statement for failing to disclose Baazov's fraud. (Am. Compl. ¶ 66.) March 21, 2016, Amaya launched PokerStars online poker and casino in New Jersey. (Am. Compl. ¶ 38.)

On March 22, 2016, after ex parte hearings, the BDR issued, but did not publicly announce, the BDR Order enjoining trades. (Am. Compl. Ex. 2.) Baazov was charged criminally with insider trading in a Quebec court; he initiated a leave of absence that culminated in his resignation from Amaya and Gadhia was named Chairman of the Board of Directors. (Am. Compl. ¶ 49; Ex. 3; ¶ 16.) This marks the end of the class period.

Before the market opened on March 23, 2016, (i) the AMF issued a press release announcing charges against Baazov resulting from the AMF investigation (Am. Compl. ¶ 67; Horowitz Decl. Ex. G), (ii) Amaya issued a press release responding to the charges, which it filed with the SEC on Form 6-K as required by the Exchange Act (Horowitz Decl. Ex. H), and (iii)

the AMF issued a second press release announcing that it obtained the BDR

Order (Horowitz Decl. Ex. I.)

In its press release announcing the charges against Baazov under the

heading "Matter of Amaya inc." the AMF announced:

> David Baazov, president, CEO, board chairman and a
> significant shareholder of Amaya, [I]nc., is facing five charges,
> in particular for aiding with trades while in possession of
> privileged information, influencing or attempting to influence
> the market price of the securities of Amaya [I]nc., and
> communicating privileged information.

(Horowitz Decl. Ex. G.) The release continued, "Based on the AMF's

investigation, the respondents are alleged in particular to have used,

between December 2013 and June 2014, privileged information pertaining

to the securities of Amaya, [I]nc. for trading purposes." (*Id.*)

In its press release responding to the charges, Amaya stated:

> Amaya does not anticipate the charges will have any impact on
> the management or day-to-day affairs of the operating business.
> Operations continue as usual and there will be no change to the
> PokerStars or Full Tilt product offerings, either in customer
> experience, player fund security or game integrity. Amaya will
> continue to communicate with its regulators and does not
> currently anticipate any material negative impact on its current
> or potential licenses, approvals or partnerships as a result of the
> allegations against Mr. Baazov.

(Horowitz Decl. Ex. H.) Gadhia stated:

> As previously noted, Amaya conducted an extensive internal
> review, supervised by its independent board members with the
> assistance of external legal counsel from Osler, Hoskin &

Harcourt LLP in Canada and Greenberg Traurig LLP in the U.S., which thoroughly reviewed the relevant internal activities surrounding the Oldford Group acquisition. This review found no evidence of any violations of Canadian securities laws or regulations. The independent members of the board received and reviewed the information and concluded that no action should be taken. We have not been provided with any new information upon which the AMF's allegations of infractions are based.

(*Id.*) The AMF press release announcing the BDR Order provided:

On March 22, 2016, at the request of the AMF, the [BDR] issued several freeze orders and orders to cease trading in securities against Josh Baazov, Craig Levett, Nathalie Bensmihan, Isam Mansour, Mona Kassfl, Allie Mansour, John Chatzidakis, Eleni Psicharis, Alain Anawati, Karl Fallenbaum, Earl Levett, Feras Antoon and Mark Wael Antoon. The AMF alleges that these individuals traded while in possession of privileged information or they leaked privileged information about potential mergers and acquisitions involving Amaya inc. in particular.

(Horowitz Decl. Ex. I.)

On March 23, 2016, Amaya's stock price opened at $10.30 per share, down from a close of $14.25 per share the day before. The stock price closed on March 23 at $11.18 per share. (Horowitz Decl. Ex. M.)

On March 29, 2016, Amaya issued a press release, providing an update on the AMF proceedings in which it explained that, when it issued its press release on March 23, 2016 concerning the AMF charges, it was unaware of the BDR Order and that it concerned alleged conduct by Baazov

"beyond the scope of the charges and of the [Company's] internal

investigation." (Horowitz Decl. Ex. J.)

> On March 23, 2016, Amaya announced that the AMF had
> charged Mr. Baazov with aiding with trades while in possession
> of privileged information, influencing or attempting to
> influence the market price of securities of Amaya and
> communicating privileged information.
> Subsequent to that announcement, the Board became aware of
> a decision of the [BDR], the administrative tribunal in Quebec
> that hears certain AMF applications, which discloses additional
> AMF investigations into the alleged conduct of Mr. Baazov and
> others which are beyond the scope of the charges and of the
> internal investigation referred to in Amaya's March 23rd
> announcement. While none of these allegations have been
> proven, the Board takes them seriously and has expanded the
> mandate of the Special Committee to investigate these
> additional matters.

(*Id.*) Gadhia, Amaya's new Chairman of the Board was tasked with

investigating Baazov.

The Amended Complaint contains four counts for damages

purportedly on behalf of a class consisting of all persons other than

Defendants who purchased or otherwise acquired Amaya securities

between May 26, 20015 and March 22, 2016. (Am. Compl. ¶ 1.) Count I

states a claim pursuant to Section 10(b) of the Securities Exchange Act of

1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.10b-5, against Baazov, Sebag, and Amaya.

Count II is brought under Section 20(a) of the Exchange Act, 15 U.S.C. §

78t(a), against Baazov and Sebag as "controlling persons." Count III alleges strict liability against all Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k. Finally, Count IV asserts violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, by the individual Defendants as senior executive officers.

## Motion to Dismiss Standard

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's

entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

"[I]n cases alleging securities fraud, plaintiffs must 'satisfy the heightened pleading rules codified in' the [Private Securities Litigation Reform Act, or] PSLRA." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493 (3d Cir. 2016) (quoting *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009)). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum*, 361 F.3d at 224). The Third Circuit has advised that, at a minimum, a plaintiff must allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256,

76-77 (3d Cir. 2006) (quoting *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Avaya*, 564 F.3d at 252. First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Securities Laws

Section 10(b) of the Securities Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ." 15 U.S.C. § 78j(b). The SEC has in turn promulgated Rule 10b-5, which makes it unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in

order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. *OFI Asset Mgmt.*, 834 F.3d at 493.

To state a claim for securities fraud under Section 10 of the Exchange Act and Rule 10b-5, a plaintiff must plead the following: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen, Inc. v. Conn. Retirement Plans & Trust Fund*, 133 S. Ct. 1184, 1192 (2013) (internal citation omitted).

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 218 n.12 (1976). Under the PSLRA's second pleading requirement for Exchange Act claims, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In evaluating scienter's "strong inference" requirement, courts must weigh "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). A

"strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *see also id.* at 324 ("The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences." (Internal quotation marks omitted.)). The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323; *see also id.* at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically.").

An Exchange Act plaintiff must also plead a connection between the misrepresentation or omission and the purchase or sale of a security and reliance. *Amgen*, 133 S. Ct. at 1192; *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). Plaintiffs can invoke a rebuttable presumption of reliance based on what is known as the "fraud on the market" theory, under which "the market price of shares traded on well-developed markets reflects all publicly available information available, and, hence, any material misrepresentations." *Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988). Under that doctrine, a court can assume an investor relies on public misstatements whenever he "buys or sells stock at the price set by the

market." *Id.* at 247. Finally, an Exchange Act plaintiff must allege economic loss and loss causation, i.e., a causal connection between the material misrepresentation and the loss. 15 U.S.C. § 78u-4(b)(4).

Section 20(a) of the Exchange Act imposes joint and several liability on any individual who exercises control over a "controlled person" who violates Section 10(b). 15 U.S.C. § 78t(a); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005). The three elements of a Section 20(a), or "control person" claim are as follows: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud. *In re Suprema Specialties,* 438 F.3d at 286. "Under the plain language of the statute, plaintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the [Exchange] Act." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013) (quoting *In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 153 (3d Cir. 2004), *abrogated on other grounds by Tellabs,* 551 U.S. 308). Accordingly, liability under Section 20(a) is contingent upon sufficiently pleading an underlying violation of Section 10(b) by the controlled person. Culpable participation refers to either knowing and substantial participation in the wrongdoing or inaction with the intent to

further the fraud or prevent its discovery. *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975). "[A] difference of opinion has emerged among district courts of this Circuit as to the pleading requirements for a § 20(a) claim." *Belmont,* 708 F.3d at 485.

Similarly, "[t]o state a claim for control person liability under Section 15 of the Securities Act, the plaintiff must allege (1) a primary violation of the federal securities laws by a controlled person or entity; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation." *Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 178 (D. Del. 2010).

Section 11 of the Securities Act promotes compliance with required disclosure provisions relevant to public offerings contained in registration statements "by giving purchasers a right of action against an issuer or designated individuals (directors, partners, underwriters, and so forth) for material misstatements or omissions in registration statements." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015). It provides: "In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated

therein or necessary to make the statements therein not misleading, any person acquiring such security . . . [may] sue." § 77k(a). "Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out. Either way, the buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." *Id.* (citing *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381-82 (1983)).

Analysis

A. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Baazov, Sebag, and Amaya.

The Court finds that Plaintiffs' factual allegations sufficiently plead that certain statements Defendants made during the class period were false and misleading because they failed to disclose that Baazov engaged in insider trading. The Amended Complaint specifies what Baazov did, who he did it with, and how what he did constituted a violation of the securities laws. At this stage of the litigation, Defendants' argument that there were two separate AMF investigations does not serve to nullify Plaintiffs' allegations. Baazov's statements that he had disclosed to the board of directors any fraud involving management that has control over financial

reporting have and that he did not violate any Canadian securities laws been sufficiently alleged to be false, misleading, material, and knowing, because it is alleged that Baazov himself had committed fraud through insider trading. Baazov's motion to dismiss Count I will be denied.

The factual allegations, rather than conclusory statements, contained in the Amended Complaint insufficiently plead that Sebag either committed insider trading or drafted the press releases at issue. Defendant Sebag was Amaya's CFO, Treasurer, and a director during the relevant time period. Plaintiffs seek to hold him in the case based on this role and paragraphs 75 to 78 of the Amended Complaint. The personal conduct alleged is: "[Sebag] received calls from [Craig] Levett, one of the members of the Baazov Trading Ring, during the acquisition of Cryptologic, before Levett traded on that information." (Am. Compl. ¶ 75.) While Sebag signed Sarbanes-Oxley certifications that he had reported any fraud involving management, the alleged facts do not support a strong inference that he acted with the required state of mind in doing so. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 356–57 (D.N.J. 2007) (Sarbanes-Oxley certifications establish scienter only if facts are set forth to show that defendants had actual knowledge or "turned a 'blind eye'" to information showing that the

certification was erroneous). Sebag's motion to dismiss Count I will be granted.

As to Amaya, the Court does not view the company's Code of Business Conduct, which provides that all officers and directors must adhere to Amaya's confidentiality, disclosure, and insider trading policies as an actionable material misrepresentation or omission under the securities laws. Next, Plaintiffs point to an exhibit dated April 8, 2015 that Amaya attached to the May 26, 2015 Registration Statement stating that "The company is confident that at the end of the investigation the AMF will come to the same conclusion that Amaya has – that *if there were violations of Canadian securities laws, they were not committed by the Company, officers, or directors.*" (Am. Compl. ¶ 58; emphasis added to focus on what Plaintiffs allege is a false or misleading statement.) Through its motion, Amaya argues that Plaintiffs have set forth insufficient facts (1) to find the statement false or misleading, or (2) giving rise to a strong inference of its scienter.

A statement of opinion does not constitute an "untrue statement of . . . fact" simply because the stated opinion ultimately proves incorrect. *Omnicare*, 135 S. Ct. at 1327 (in the context of a Section 11 Securities Act claim). If the opinion expressed was not sincerely held, it

qualifies as an untrue statement of fact. *Id.* Further if a registration statement omits material facts regarding a statement of opinion and those facts conflict with what a reasonable investor objectively would perceive, then the omission creates liability as misleading. *Id.*

In this case, there are no factual allegations that Amaya's April 8, 2015 press release was insincere; the statements cited are purely opinion, as expressly indicated by the wording, "the company is confident that . . . ." In addition, Plaintiffs have not alleged facts that would tend to give rise to a perception of omission on Amaya's part as to the bases for its opinion. As such, Amaya's April 8, 2015 press release does not constitute an actionable material misrepresentation or omission.

As part of a June 1, 2015 Amaya press release attached as Exhibit 99.1 to an Amaya SEC filing under the Exchange Act, Form 6-K, Baazov stated: "I believe that any concerns that I or other Amaya officers or directors violated any Canadian securities laws are unfounded and we are confident that at the end of its investigation, the AMF will come to the same conclusion." (Am. Compl. ¶ 62.) Although this is a statement of opinion, Baazov is plausibly alleged to have lacked sincerity in making it. In addition, the Court has already determined Baazov's Sarbanes-Oxley certification in the May 2015 Registration Statement to be actionable.

The Court imputes Baazov's strong inference of scienter to Amaya. "[I]imputation to an employer is proper based on acts committed by one of its agents within his actual or apparent scope of authority." *Belmont*, 708 F.3d at 496. *See also In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471 (9th Cir. 2015). The "adverse interest" exception, "which directs a court not to impute to a corporation the bad acts of its agent when the fraud was committed for personal benefit," *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 64 (2d Cir. 2013), is inapplicable here. *See ChinaCast*, 809 F.3d at 477 (finding that even in the case of embezzlement, "the adverse interest rule collapses in the face of an innocent third party who relies on the agent's apparent authority).

Amaya's failure to disclose Baazov's conduct in its filings allowed the company to continue to attract investors and customers; thus, the company benefitted from the misleading statements, preventing a decline in the company's stock price. Although Plaintiffs argue that Baazov's misconduct raised risks of regulatory backlash and jeopardized Amaya's New Jersey gaming license, the company should not benefit at the detriment of innocent third party investor.

B. Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Baazov and Sebag as "controlling persons" and violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, by the individual Defendants as senior executive officers.

The Court finds no particularized allegations of Sebag's, Gadhia's, or Goodson's[1] alleged control of, or culpable participation in, any of the alleged false or misleading statements made by Amaya and Baazov. The conclusory statement that Sebag was "able to, and did, control the contents of the various reports, press releases, and public filings," (Am. Compl. ¶ 101), is insufficient to survive a motion to dismiss. As to Gadhia and Goodson, there are no factual allegations other than that they were directors. Counts II and IV will be dismissed as to Sebag, Gadhia, and Goodson.

C. Strict liability against all Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k

Defendants argue that Plaintiffs do not and cannot allege they purchased securities issued pursuant to the November 2015 Registration Statement filed pursuant to Section 6 of the Securities Act because Amaya

---

[1] At this stage of the litigation, the Court is satisfied that Plaintiffs have pled, in good faith, legally sufficient allegations of personal jurisdiction over Gadhia and Goodson based on the nationwide service of process provision in the Securities Act. The claims against the two directors arose from their activities in the United States, that is, the filings with the SEC.

did not issue any securities pursuant to either the May or November Registration Statement.

"By its terms, Section 11 provides that '*any* person acquiring' a security issued pursuant to a materially false registration statement may sue (unless the purchaser knew about the false statement). 15 U.S.C. § 77k(a) (emphasis added)." *In re Suprema Specialties*, 438 F.3d at 274 n.7. Plaintiffs' assertions of stock purchases "in" or "traceable to" public stock offerings are sufficient at the pleading stage. *Id.* Section 11 claims are generally not subject to the heightened pleading standards required under the PSLRA; rather, the liberal notice pleading requirements of Federal Rule of Civil Procedure 8 generally apply, unless the claims "sound in fraud." *Id.* at 270.

In this case, Plaintiffs expressly state that their Section 11 claim does not sound in fraud. (Am. Comp. ¶ 104.) They allege that they purchased Amaya stock "traceable to" the "Offering" that was made pursuant to "the Registration Statement" which "was inaccurate and contained untrue statements of material fact, omitted to state facts necessary to make the statements made therein not inaccurate, and omitted to state material facts required to be stated therein." (Am. Comp. ¶¶ 116, 108.) Accordingly, Count III has been sufficiently pled.

## Conclusion

For these reasons and those stated on the record during oral argument, the motions of Defendants Amaya, Inc. [47] and David Baazov [50] will be denied. The motions of Daniel Sebag [48] and Divyesh Gadhia and Harlan Goodson [49] will be granted in part and denied in part. Defendants' motions to strike are denied. An Order will be entered.


Dated: June 15, 2017            /s/ Joseph H. Rodriguez
                             JOSEPH H. RODRIGUEZ
                                U.S.D.J.